The next matter, number 241594, Brandon Velez v. Rachel Eutzy et al. At this time, would counsel for the appellant please introduce herself on the record to begin. Madeline Meth for appellant Brandon Velez, and may it please the court, I'd like to reserve two minutes for rebuttal. You may. On each claim, defendants ask this court to apply an upside-down summary judgment standard, viewing the facts and drawing inferences in the officer's and the city's favor rather than in Velez's. I'll begin with Velez's retaliatory arrest and analogous claims. Defendants stopped Velez because he had a broken headlight. When Eutzy arrested Velez less than a minute into the stop for this minor traffic violation, all that she had learned was that Velez was parked in a turned-off car in front of his home, that he did not know why he had been stopped, that he was scared, and that he wanted to hold the police accountable by getting valid, simple questions answered and by recording using his cell phone. When you say by recording, that's what puzzles me. We have a video here from a body camera. I could have watched that 50 times and it wouldn't have occurred to me that he was recording something. I guess he reached and grabbed his phone, which, needless to say, caused the officer some angst when they stop a car and someone starts reaching for something. But he never held the phone out towards her or did anything that looked like he was recording. Your Honor, I agree that when someone reaches towards their pocket during a traffic stop, that may be cause for concern for a reasonable officer, but I point the court to JA-142. This is Officer Yuzzi's deposition testimony where she talks about this precise moment, and she acknowledges that she knew that Velez had retrieved only a cell phone. And to your question about how would she know that he planned to use the cell phone to record, I think we're applying the summary judgment standard here, and we're drawing all reasonable inferences in favor of my client, and I think that this is plainly a reasonable inference, and I'll draw out the context for you. Yeah, how can that be true when you look at the – I mean, under Scott, we're allowed to look at the video. Yes. So the complaint alleges that she arrested him because he was going to record, so that's a representation. Then I look with my own eyes at the video, and I can't discern why you would think that. So under Scott, aren't I supposed to go with the video? No, Your Honor, because under Scott, where the video is unclear. But what's unclear about the question of whether the arrest was because he was going to record, if I can't see anything in it that gives an indication that that's why she was arresting him? Sure. Your Honor, sometimes video reveals indisputable facts, but sometimes it does not, and that's where we look to the rest of the record to fill in the gaps. And here, as to whether the reason for the arrest is certainly his effort to record and also his other First Amendment-protected activity here, remember at the start of the video, we plainly hear my client criticizing the officer. Let's put that as a separate claim, though. Let's just do the recording first. It is separate, but the context of the criticism is critical to understanding why you'd see new that he was attempting to record here. So we have at JA 142 her admission that the district court ignored, viewing the video evidence and saying from the video it was unclear whether she knew he retrieved a phone. But we have her precise testimony that says she knew this was a phone. But even if you know someone's retrieving a phone, and I see people retrieving a phone, I don't usually think they're going to record me. I think that's right, Your Honor, but we're thinking about this from the reasonable officer's perspective, and here's the context. We have an individual who's shared with the officer that he's parked outside his home. He's asked why has she opened his door. He's scared. He has his hands up in this deferential position. He's criticizing her. That appears to agitate her, and then he retrieves his phone. But also we have the context of this is February 2021. Officers know that often people are recording them using their phones, and we have the clearly established law. So, for example, Garrick, from 10 years prior, that clearly establishes the individual's right to record, and we also have... But isn't the other thing that puzzled me about this is she is recording the scene. So why would she be concerned that he might turn on the recording device on the cell phone to record the scene? In fact, it's lucky for her she was recording the scene. So, of course, he doesn't know that she's recording the scene, but I think you... But we're talking about her... Your premise is that she saw him... Once she saw him get a cell phone or a smartphone, she deduced that he was doing it to record the scene, and she didn't want the scene to be recorded, so she retaliated. And she does all that as she's recording the scene. So, Your Honor, I'd point the court to later in the record of not UC's body cam, but the other officers, so Siegel and Slocum's body cam footage, where we see them express hostility towards the neighbors who are recording. And so this also demonstrates that there must be some hostility towards this effort to record because it's showing disrespect towards the police officer, is my sense. But I think this is a great question for the jury, and I want to turn to why there was a lack of probable cause here. And just so I understand, even if the district court were correct, which I know you think it's not, in relying on Scott to resolve the recording claim, the probable cause issue stands as an independent question that supports the other claims, independent also of the criticism retaliation claim, correct? That's right. So the lack of probable cause would mean that the arrest was wrongful, even if you disagreed with our arguments about the First Amendment protected activity here. On that point, the complaint alleges that it was immediate that after she says, cop out of the car, they immediately grabbed him. And so the question is whether the district court's view, I guess, was what? That the video showed that it wasn't immediate and that in the interim he had disobeyed that order? I think that is the district court's view, but I want to emphasize that disobeying that order does not generate probable cause here. But let's imagine it did, and I understand that even if it did, the allegation of it being an immediate grabbing would prevent the officer from having the probable cause defense, correct? Because if they grabbed him immediately, then you couldn't say he was disobeying the order. That's right. So if the arrest happens immediately, then you don't have probable cause. And then some of your claims then can go forward. So a threshold point on that, unless I'm missing something, is does the video sufficiently demonstrate that the officer did not immediately grab him? So I don't think, so yes, our view of the video is that... It doesn't show that clearly enough to trump the complaints allegations. Is that it doesn't show that clearly enough to trump the complaints allegations. But I also would emphasize that I don't think the timeline is, I don't think our retaliatory arrest claim rises and falls with the timeline because... Not the retaliatory arrest, the other one. Oh, the wrongful arrest. I still think that there's a lack of probable cause here at the point when the arrest begins because the disobedience here... This all depends on A, whether she gave an order, and B, whether there was any opportunity to comply with the order, so that she could reasonably conclude that there was noncompliance. She may be able to reasonably, but I guess my point is that it's not material whether she could reasonably conclude that he disobeyed this order because we're looking at two New Hampshire criminal statutes here to understand whether a reasonable officer would have probable cause. So let me understand what you're saying, and then I'll let you go on. You're saying that even if she said, get out of the car, and he said, no, I'm not going to get out of the car, your position is she could not have then forcibly removed him. That's right, Your Honor. And that's specific to New Hampshire law here, and that's because the two... And just before you get to New Hampshire, I just want to understand what we necessarily have to reach to decide the case. Since the allegation in the complaint is that there was an immediate arrest of the person, I take it your allegation in the complaint is that there was no disobedience, period. That's right. The allegation in the complaint... If that were true, you would win no matter what you're about to say. Yes. Unless, looking at the video under Scott, it so clearly trumps that allegation that we should go with the video. That's right. And on that point, I take it you're saying the video does not in any clear way make that allegation so wrong that we should look to the video rather than the allegation. That's our position. The only problem is I looked at the video and it was a total mess. It was a nightmare. And the... I don't want to make a joke, but I mean, it's got two marks. You're going to believe the complaint or you're going to believe your own eyes. I mean, it does look like he's not going to get out. And it does look like he's grabbing onto the bars. And it does look like... I mean, so what do we do? I mean... So I viewed the video many times. I'm sure your honors have viewed the video many times as well. No, I've only... a couple of times. A couple of times. And to the extent that you view this video as being messy and hard to determine what's going on, at this stage, what you should do is look to the rest of the record to understand. It looks like he reached back and he grabbed something inside the car there that was holding him. That's what it looked like. Okay, so that's not something that I've seen on the video. And one thing that I'd ask the court to inquire of my colleague on the other side is for a particular citation to the video. I'll go look at the video. And in my right, there's two videos. There are several videos, yes. Different angles, different officers, different body cam. That's right. But I do want to emphasize why whether a reasonable officer would have believed that Velez was engaged in intentional physical interference, which is the standard under the resisting arrest statute, and not disobedience, is a disputed fact at this stage. And it's both because of the video evidence. Because the video shows that Yudzi and Slocum are observing that Velez is terrified here. And that once he's physically under attack, he's being grabbed, punched, and teased, he is unable to physically comply. And the video shows we can hear him audibly essentially hyperventilating. And that's also how Velez describes his experience of the events at J66. He thinks that these are going to be possibly his last moments on earth, in his words. And it's also consistent with Slocum's testimony at JAA 202 about individuals' defense mechanisms during arrests and how he understands that his words are a fight-or-flight mechanism. We don't see on the video that my client is fighting at all here. We may see him shrinking back into the car reflexively because he's unable to comply. I want to emphasize, and this is relevant to the excessive force claim as well, that our view of the video is that it reflects that the officers were in control of the situation for the entire encounter. The officers are the professionals here. And it's true that officers often have to make split-second decisions to protect themselves, to protect safety. But here, the video shows that the officers had the opportunity to slow this encounter down, to use the conversational customer service tone. And unfortunately, sometimes they have to deal with valid criticism or feeling disrespected on the job. And once they grab, punch, and Velez here, he is unable to comply with their orders. Thanks so much. Thank you, Counsel. At this time, would Counsel for the Appellees please introduce herself on the record to begin? May it please the Court, Keelan Forrey for the City of Manchester and Manchester Police Officers Rachel Utsi, Eric Slocum, and Casey Siegel. The District Court applied the summary judgment standard correctly here, and it applied the law correctly. It correctly concluded that summary judgment was entitled to the defendants. Mr. Velez is simply upset with the outcome in this case. Now, before I turn to actual claims and some of the arguments that Mr. Velez has made, I do just want to discuss Mr. Velez's deposition testimony, and that's in the record. And I want to discuss specifically how he describes the incident. He describes his body behavior during the incident as pretty chill. He says that he has no recollection of the officers making any attempts to physically remove him from the vehicle until the point that Officer Slocum deployed his taser. He says he has no recollection of the officers ordering him out of the vehicle at any point. He also has no recollection of the officers advising him that he was under arrest. All of this testimony is plainly contradicted by the video evidence in this case, and it's contradicted by the officers' testimony. So with that framework in mind, I'm happy to begin with the retaliatory arrest claim, unless your honors would like to start with a different claim. So turning to the retaliatory arrest claim, there's no record evidence showing any sort of improper motive arising out of the arrests here. As we know, Mr. Velez made no statements during the arrest that suggested that he wanted to record the encounter or that he intended to record the encounter. And there's just absolutely no basis in this record to support Mr. Velez's inference that Officer Utsi should have somehow known that he intended to record the encounter. There's also probable cause here, and that defeats Mr. Velez's retaliatory arrest claim and his wrongful arrest claim. Mr. Velez was charged with two misdemeanors on this evening. He was charged with resisting arrest and disobeying a police officer, and I'm happy to talk about the probable cause for both. Turning to the resisting arrest claim, Mr. Velez offers two, I would say, competing arguments in terms of why there was no probable cause in this case for the charge of resisting arrest. He first argues that he wasn't resisting, but he second argues that any of his body language was a response out of fear. So in some ways he concedes that he was physically struggling with the officers, but to the extent that that body language was perceived by them as resistance, that was incorrect. You've looked at the video, I'm sure, more times than we have. What's your view as to how much time passed between when she gave an order and when she touched him? So when we look at the video, the video supports how Officer Utsi has testified that this interaction occurred. And so at the point that she gave the order that he needs to exit the vehicle, he can be heard on the video saying, no, you can't do that. And what's the that that he's saying in response to? It appears to be the order to exit the vehicle. How clear is that? That's what's unclear to me from watching it. She says, go ahead and hop out, and he says, no, you can't do that. But in between she's shining a flashlight, and then there's another video that shows I thought somebody starting to reach to grab him. So in terms of the specific question of the time that he was given to comply, I would say that, first, I do think that his response was directly in response to that order. I mean, conversationally, it happened right after. But I would argue that there's additional support that Mr. Velez's time to comply had expired. It was a quick second to comply because at this point in the interaction, Officer Utsi had an imminent concern for her safety. And that's because we know that Mr. Velez had had his hands raised in the air, which to the officers was unusual and a little bit concerning because it was a routine traffic stop. And then he made that sudden motion into his left-hand pocket. So those two events, which can't be disputed, they're captured on the footage. And when does the—she says, hop out. That's before he reaches? No, that's immediately after. So he reaches into his left-hand pocket, and she gives two quick orders. She says, get your hands out of your pockets, and then, all right, go ahead and hop out. And he says, no, you can't do that, and turns into the car. And when is the—in that other body cam video, there is one of another officer or some officer you can see reaching towards him? Am I right? I think so. Right around that point in the interaction, Officer Slocum, who was on the passenger side of the vehicle because he was training Officer Utsi that night, I think he senses that the situation has evolved, it's evolving quickly. He comes over to the driver's side, and he also reaches into the vehicle. And so is it possible he's saying, no, no, you can't do that, to the reaching, as opposed to, I'm not going to comply with your order? Because just linguistically, hop out of the car, no, you can't do that, they're not perfectly syntactically connected. I appreciate that. See what I'm saying? Like, no, no, you can't do that is more like you can't grab me. Hop out of the car, no, you can't do that, that's not really the way normally you would respond to hop out of the car. I'm not going to, or something like that. I mean, maybe. I'm just saying if you're—could a jury find otherwise? I just don't know how you— I don't think so, not based on this record, because as we can see in the several minutes following this, there was other orders to get out of the vehicle, and Mr. Velez certainly shows no indication of wanting to exit the vehicle voluntarily. How does qualified immunity play into this? In other words, what's the precise question for us? Is it, could a jury look at this and think that that didn't mean get out of the car? Or do we ask, would an objectively reasonable officer in her place have been clear to that officer that he was saying something else other than refusing to comply? I think it's whether a reasonable officer in these officers' shoes would perceive Mr. Velez's conduct that night as resistive, and I think that certainly weighs in their favor. And I think it's whether a reasonable officer in these officers' shoes would perceive Mr. Velez's conduct as posing an imminent threat to their safety, and I think that that also weighs in their favor. So although I don't think there's any constitutional violation here, as the district court also concluded, I think that at the very minimum, qualified immunity would attach, because I don't think that there's any clearly established law on point that it would have put the officers on notice that this was somehow unreasonable force. Just to put Judge Cahada's point, at least from my perspective, in a way that would be helpful to me, suppose two things happen roughly simultaneously. One officer says, hop out of the car, and at the same time another officer is reaching toward him. Both things are happening. The defendant, the subject of the police action, says, no, no, you can't do that. Does that, a reasonable officer, we say a reasonable officer would think he was responding, or is that for the jury to figure out what was he responding to? I don't know how the law works here. It's not, because we can look at the record as a whole here. So let's actually start earlier in this interaction. Mr. Velez had his window rolled up. The officers were already on guard. For that reason, you thought... No, I understand, but just take my example. Suppose I thought the relevant moment, the key moment, is that moment. And if I thought the video showed those two things happening simultaneously in that response, what is your position as to what the right legal answer is? The right legal answer is that using soft hand control techniques to remove a person who has been stopped as a result of a lawful motor vehicle stop and also given a verbal order to exit the vehicle is not excessive force. It's not an unreasonable use of force. I think giving a verbal command while simultaneously... And that's not wrongful arrest either? No. I mean, Mr. Velez wasn't told that he was under arrest until Officer Slocum, several seconds later into the interaction, when he was putting his arm on the A pillar and the B pillar in the car, when he was very resistant. And just on the narrow question of do you have a view of, in my example, if I thought the record showed these two things happening simultaneously, and then he says, no, no, you can't do that. With respect to what that shows as the probable cause for disobedience of an order, do you have a view of what we're supposed to do legally in that circumstance? What's the answer? My answer to that is that I would like to look at the charging document for why he was charged with disobeying a police officer. So he was charged at Joint Appendix 224 with disobeying a police officer for failing to provide his name to the officers. And so that happens later in the interaction. And if you mean by the resistance charge, I would say him saying, no, no, you can't do that, and I understand that we're not sure if it's the grab or the verbal command. That's Your Honor's position on that. But regardless, I think that there's ample probable cause later in the interaction to support that a reasonable officer in these officers' shoes could reasonably conclude that they had probable cause to arrest him at the point when they announced that he was under arrest. That's at, I would say, minute 30 or so on the body-worn camera footage. So when they order him out of the vehicle, they haven't said you're under arrest yet. That comes later in the interaction. But I thought the first statement of you're under arrest preceded him refusing to give his name and address. That is correct, Your Honor. He was already in handcuffs when the officer, Officer Slocum specifically, asked him for his name twice. But probable cause for another charge can arise after someone's already in handcuffs. And your position is probable cause arose before he was handcuffed for failing to get out of the car? For resisting arrest. Yes. And then additional probable cause arose after he was handcuffed for not answering questions. Disobeying a police officer, which that New Hampshire statute has a section regarding not responding to an officer with your name and identity when requested. In your answer, Judge Cato, you said probable cause arose as the first instance. You said resisting arrest. Correct. Is that the same as disobeying a lawful order? Two separate statutes in New Hampshire. And I can reference them if it's helpful. But the resisting arrest charge arises under 642-2, RSA 642-2. Disobeying a police officer, it's a separate charge. That arises under RSA 265-4. And in this particular charge, not responding. Did you mean that the resisting was the disobedience, not disobeying the order? No. If we look at the charging documents, which are in the record, he was charged with resisting arrest because of his refusal to submit to the handcuffing. That occurs later. That occurs later. So doesn't he have a claim that's predicated on what was done to him in getting him out of the car or not? I'm not sure I understand the question. There's a lot of different claims, and they relate to different things that happened over time. Yes. I thought one of his claims pertained to what was done to him in getting him out of the car to begin with, up until some other point where he does something that gives rise to, you say, new authority to do things to him. Absolutely. I understand, Your Honor. I'm sorry. His excessive force claim is actually not related to his resistance during the handcuffing process at all. He only complains of the excessive force of removing him from the vehicle. So with respect to the removing him from the vehicle, is there any basis for probable cause that would undermine the claim of excessive force, short of the disobeying the officer's order? I would submit that we don't need to look at probable cause at that point in the interaction because Mr. Velez concedes the lawfulness of the motor vehicle stop. He admits that his headlight was out, and the officer was entitled to give a lawful order to exit the vehicle so that she could pat him down for weapons. He wasn't under arrest at that point. She had simply ordered him to exit the vehicle so that she could pat him down. He refused to comply, and then that's where all the probable cause for these charges thereafter arose. That's the timeline that we're working with. And it's confusing because we talk about resistance in two instances here, but the charge for resistance arose specifically after she had given the lawful order to exit the vehicle. So in terms of the lawfulness of the motor vehicle stop and her ability to order him out of the vehicle, I don't think that's an issue that we need to discuss because Mr. Velez concedes the lawfulness of the initial motor vehicle stop. I would just, with my last remaining moments here, just say that while summary judgment requires the district court to construe the facts in the light most favorable to Mr. Velez, in opposing summary judgment, the burden is on him to demonstrate that there's a genuine issue of material fact and to satisfy this burden, he has to produce affirmative admissible evidence. And he cannot rely on speculation or improbable inferences that are not supported by the record and in many cases are contradicted by the record. And he can't rely on his own subjective beliefs about the event, about what he thought he was doing or he thought he was scared and he was conveying that he was scared. For all of the claims that he's brought, the inquiry is into whether it was reasonable for an officer, an officer Utsi or Slocum to choose how they perceived his conduct. And his conduct was resistive, it was combative at times, and he was certainly not submitting to arrest and he was giving verbal and physical indicators that he was going to continue to be non-compliant and they continued to be unable to clear whether he had a weapon on him or in the car. They used a measured proportional response to get him out of the vehicle, to place him in handcuffs, place him under arrest, and at that point in the interaction, as the body camera footage shows, all four stopped, everything stopped, Mr. Velez was finally subdued. And the district court's conclusion should be affirmed. Thank you. Thank you, Counsel. At this time, Counsel for the Appellant, please reintroduce herself on the record. She's a two-minute rebuttal. Madeline Meth again for Appellant. I want to focus on this no, no, you can't do that language. And I certainly agree with Your Honor, Chief Judge Barron, that there are different inferences that can be drawn about what this language means. But I want to also emphasize that the New Hampshire statute for resisting arrest and disobeying a police officer, these two different criminal statutes, exempt verbal protestations alone. So that is in the text of the resisting arrest statute. It says verbal protestations alone are insufficient to generate probable cause for resisting arrest. And the other statute that we're looking at that has that disobeying a police officer in the title, it's very specific. I'm puzzled, how does that work? If a verbal protestation is not, so an officer comes up to a person, the person says get out of the car, the person says no. You're good. That is not sufficient to generate probable cause for resisting arrest. What happens next then? I guess next the officer has to reach and grab the person? So the officer may have to give the person time to comply. No. So first I note that that's not the language that we have here. It's no, no, you can't do that. Under a different statute, which defendants have never suggested any other reason for generating probable cause here, it may be that that disobedience is relevant for generating probable cause. But as my friend on the other side just emphasized, we can look at the charging documents here. They're at J.A. 224 and J.A. 225. And they contain false information. One says that my client refused to give his name and date of birth to Officer Yutzey. Here the video indisputably shows that Officer Yutzey never asked for that information. And the other says resisting arrest at a handcuffing stage. And to the extent that that's true, none of our claims depend on that point in time. Thank you. That concludes argument.